❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>a Maroon 2008 Volvo CX90 SUV bearing North<br>Carolina license plate, KAV6000 (Volvo) (Target<br>Vehicle), as further described in Attachment A-2 | )<br>)<br>)  Case No. 24-921M(NJ)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the          Eastern          District of          Wisconsin
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 10/4/2024          *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to          Hon. Nancy Joseph          .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for ____ days *(not to exceed 30)*    ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: 9/20/2024 @ 12:00 p.m.

*Judge's signature*

City and state:    Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A2

## PROPERTY TO BE SEARCHED

The property to be searched is a maroon 2008 Volvo CX90 SUV bearing North Carolina license plate KAV6000.



1

# ATTACHMENT B

## ITEMS TO BE SEIZED

All records, information, and items relating to violations of 21 U.S.C. §§ 841(a)(1), 843 and 846, between June 1, 2024 to present including:

a. Evidence of the crime described above;

b. Controlled substance, including fentanyl and methamphetamine, paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;

c. Preparatory steps taken in furtherance of that crime;

d. Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;

e. Evidence of motive, intent, or knowledge of the crime described above;

f. Evidence of the location, whereabouts, and patterns of travel of Karina S. BOOKER;

g. Evidence about the appearance, clothing, and identity of Karina S. BOOKER;

h. All bank records, checks, credit card bills, account information, and other financial records;

i. Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

j. Lists of drug customers and related identifying information;

k. Types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

l. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

m. Indicia of residency and ownership;

n. Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

o. U.S. Currency;

p. Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation; and

2

q. Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the locations or person described in Attachments A, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of Karina S. BOOKER to the fingerprint sensor ("Touch ID") and (2) to present the face of Karina S. BOOKER to the facial recognition sensor, such as a camera, ("Face ID") of the device found at the Target Location, Target Vehicle or on Karina S. BOOKER, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

Note: The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers. If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.

3

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

a Maroon 2008 Volvo CX90 SUV bearing North
Carolina license plate, KAV6000 (Volvo) (Target
Vehicle), as further described in Attachment A-2

)
)
)
)
)
)
)

Case No.
24-921M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) & (b)(1); 846; & 843(b) | Distribution and possession with intent to distribute controlled substances; Conspiracy to possess with the intent to distribute controlled substances; and Use of a communication device in furtherance of drug trafficking. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*David Rybarik*

*Applicant's signature*

David Rybarik, FBI TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 9/20/2024

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF**</u>
<u>**AN APPLICATION FOR SEARCH WARRANTS**</u>

I, David Rybarik, being first duly sworn, hereby depose and make this affidavit in support of:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search the following premises, vehicle, and person, further described in Attachments A1, Attachments A2, and Attachments A3 (collectively, "Attachments A"), for the things described in Attachment B:

**A1.**      1030 Harbridge Avenue, Racine, Wisconsin **(Target Location);**

**A2.**      the maroon 2008 Volvo CX90 SUV bearing North Carolina license plate, KAV6000 (Volvo) (**Target Vehicle);** and

**A3.**      the person of Karina S. BOOKER (DOB XX/XX/1994)**.**

2.      I am a state certified law enforcement officer employed as a Detective with the Racine Police Department (RAPD) and a federally deputized Task Force Officer for the Federal Bureau of Investigation (FBI).  I have been a sworn officer in the State of Wisconsin for over 24 years.  I am currently assigned to RAPD Violent Crimes and Intelligence Unit (VCIU) gang division and FBI Milwaukee Area Safe Streets Task Force.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code. I am charged by the Attorney General with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States," within the meaning of Section 3051(a) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, execute warrants and to make arrests for offenses against the United States and offenses enumerated in United States Code Title 18 and Title 21.

1

3.      As a federal task force officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, thousands of dollars in United States currency and other evidence of criminal activity. As a gang detective and Task Force Officer, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have also spoken on numerous occasions with other experienced narcotics investigators, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized in the investigation of narcotics trafficking. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

4.      Based on my training, experience and participation in drug trafficking investigations and associated financial investigation involving controlled substances, I know and have observed the following:

   a.  I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

2

b.  I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

c.  I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.  I know large-scale drug traffickers must maintain on-hand large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

e.  I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control;

f.  I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

g.  It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time.  It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

h.  It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner.  These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

3

i.  I know large-scale drug traffickers often use electronic equipment such as telephones, pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

j.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

k.  I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; and

l.  I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices;

m.  Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

4

5. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

6. I am currently participating in an investigation of methamphetamine and fentanyl pill trafficking involving Karina S. BOOKER, and other known and unknown individuals. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (c) information obtained from numerous witnesses, including confidential sources; (d) controlled buys; (e) documentary evidence; (f) physical and electronic surveillance; and (g) physical seizures.

7. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from

interviews with cooperating witnesses, and informants, whose reliability is established separately herein. Because this affidavit is submitted for the limited purpose of securing authorization for search warrants, I have not included each fact known to me concerning this investigation. I have set forth only the facts I believe are essential to establish the necessary foundation for the requested search warrants.

8. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Karina S. BOOKER has committed the crimes of distribution and possession with intent to distribute methamphetamine and fentanyl pills, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1), and 846 and use of a communication device in furtherance of drug trafficking, in violation of Title 21 United States Code 843.

9. Further, there is probable cause to search the locations described in Attachment A for evidence of these crimes, as described in Attachment B.

**PROPERTIES AND PERSON TO BE SEARCHED**
**(COLLECTIVELY, "ATTACHMENTS A")**

10. **Attachment 1: 1030 Harbridge Avenue, Racine, Wisconsin (Target Location)**. This address is utilized by Karina S. BOOKER. The **Target Location** is described as a single-family style residence located at 1030 Harbridge Avenue, Racine, Wisconsin 53403. The residence has blue siding and white trim. The numbers "1030" are affixed on the east facing portion of the south porch post.

11. **Attachment 2**: The maroon 2008 Volvo XC90 SUV bearing North Carolina plate, KAV-6000 (**Target Vehicle**).

12. **Attachment 3**: Karina S. BOOKER (DOB: XX/XX/1994).

**PROBABLE CAUSE**

6

13. In June of 2024, case agents received information from confidential informant (CI) # 1 regarding this investigation. CI # 1 reported a female who uses the Facebook name "Lovely Symon" was in possession and offering to sell methamphetamine and pills (fake oxycodone hydrochloride/fentanyl pills). Case agents investigated the Facebook page "Lovely Symon" and identified the female as Karina Symon BOOKER (DOB:XX/XX/1994). CI #1 was shown a photo of BROOKER and confirmed with case agents that BOOKER was the female in possession and offering to sell methamphetamine and pills.

14. CI # 1 reported BOOKER to be in possession of four pounds of methamphetamine. BOOKER told CI # 1 she would sell the methamphetamine at $2,500 a pound. In addition, for $1,500, BOOKER would order 10,000 pills. One BOOKER received the 10,000 pills, she would provide 5,000 pills to CI # 1. BOOKER would retain the remaining 5,000 pills. CI # 1 reported that BOOKER is in a relationship with "Jabs", who case agents believe is Justin Handford (DOB XX/XX/1994) based on law enforcement databases. CI # 1 stated that BOOKER told CI #1 her methamphetamine source of supply is in Arizona. BOOKER also told CI #1 that the source of supply mails the methamphetamine from Arizona to Handford/BOOKER in Wisconsin.

15. CI # 1 has provided intelligence concerning drug trafficking activities for Karina S. BOOKER and others that has been independently corroborated through queries of law enforcement databases and by law enforcement through the investigation. CI # 1 has also made statements against his/her own penal interests. CI # 1 has five felony, one misdemeanor convictions, and an indictment. CI # 1 has no arrests or convictions relating to dishonesty. CI # 1

7

is cooperating with law enforcement in exchange for consideration regarding federal drug trafficking offenses.[1]

16.    In June 2024, case agents searched several law enforcement databases and found BOOKER listing 4204 Manhattan Driver, Racine, Wisconsin 53402 as a residence. Law enforcement databases also indicated BOOKER operated a **2008 maroon Volvo XC90 with North Carolina license plate KAV-6000 (Volvo) (Target Vehicle)**. Case agents reviewed Department of Transportation records and determined that the North Carolina license plate KAV-6000 was for a 2008 maroon Volvo XC90, listed to a registered owner of Erika Edwards in Greensboro, North Carolina. Case agents reviewed the Facebook page of BOOKER ("Lovely Symon") and found a photo of Erika Edwards, whereas BOOKER acknowledges Erika Edwards as her mother and tagged Erika Edwards. The photo of Erika Edwards match department of transportation photos of Erika Edwards.

## CONTROLLED BUYS FROM BOOKER

17.    Generally during the below listed controlled buys the CI communicated using Facebook Messenger or telephone number 262-221-0687 to arrange controlled drug transactions. The communication was recorded in some manner. The CI was followed to and from the controlled buy location, and their vehicle were searched before and after the controlled purchase with no drugs, money, or weapons located, was provided an audio/video recording-transmitting device, "buy money", debriefed after the controlled buy, and the above evidence and statements reviewed and verified by law enforcement. Additionally, the controlled substances were all

---

[1] In the middle of September 2024, case agents were made aware of allegations that CI 1 was engaged in unauthorized drug possession. Case agents have attempted to verify or discredit this information but have not been able to at this point. Case agents had not utilized CI 1 since the allegations.

8

weighed and tested positive for the listed substance using fentanyl testing wipes or Nark II test kits following the printed instructions.

18. Generally during the below listed controlled buys CI # 1 communicated with via Facebook Messenger with "Lovely Symon", who case agents believed to be BOOKER based on the communication and the fact BOOKER arrived for the drug transactions. However, at times CI # 1 was unable to physically participate in a controlled buy operation, so CI # 2 assisted. CI #2 communicated with BOOKER using telephone number 262-221-0687.

19. CI # 2 is credible and reliable because CI # 2 has provided intelligence concerning drug trafficking activities for Karina S. BOOKER and others that has been independently corroborated through queries of law enforcement databases and by law enforcement during the investigation. CI # 2 has also made statements against his/her own penal interests. CI # 2 has three felony, five misdemeanor convictions, and an indictment. CI # 2 has two open cases consisting of eighteen felonies and seven misdemeanor charges. CI # 2 has no arrests or convictions relating to dishonesty. CI # 2 is cooperating with law enforcement in exchange for consideration regarding federal drug trafficking offenses.

a. **Controlled Buy June 27, 2024**

20. On June 27, 2024, case agents met with CI # 2 prior to conducting a controlled purchase of methamphetamine from BOOKER. Prior to meeting with case agents, CI # 1 spoke to BOOKER on Facebook Messenger. BOOKER originally agreed with CI # 1 to sell CI # 2 two pounds of methamphetamine for $5000. BOOKER later increased the price to $5600.

21. CI # 2, receive a call from a blocked number. Upon CI # 2 answering the call, a female stated, "I'm supposed to be meeting you". CI # 2 replied she/he would be at the meet location in five minutes. The female caller and CI # 2 acknowledged one another, and the call

9

ended.  CI # 2 went to the parking lot of a Petro Mart at 717 South Sylvania Avenue, Sturtevant, Wisconsin. After a period of time case agents observed a maroon **Volvo** having a North Carolina license plate (**Target Vehicle)** pull into the parking lot next to CI # 2's vehicle.  CI # 2 exited CI # 2's vehicle and entered the maroon **Volvo (Target Vehicle)**.  Through the use of the audio/video recording-transmitting device, case agents observed the driver and sole occupant as BOOKER.  BOOKER then sold CI # 2 two pounds of methamphetamine for $5000, allowing CI # 2 to owe BOOKER $600.  CI # 2 returned to their auto. Case agents followed the maroon **Volvo (Target Vehicle)** as it left the parking lot.  Agents identified **the maroon Volvo** as a **maroon 2008 Volvo CX90 SUV bearing North Carolina license plate, KAV-6000 (Volvo)** (**Target Vehicle)**.

22.  CI # 2 then met with case agents and turned over the two pounds of methamphetamine. CI # 2 stated that once CI # 2 arrived in the parking lot, after a period of time CI # 2 called CI # 1 to inquire as to the whereabouts of the female. Shortly after speaking with CI # 1, CI # 2 received a blocked call from the female.  The female informed CI # 2, she believed she had arrived.  After a conversation as to CI # 2's location, they realized the female was at a nearby location.  Shortly after the call, a female driving the **Volvo (Target Vehicle)** arrived and parked next to CI # 2.  CI # 2 exited CI # 2's vehicle and entered the front passenger seat of the **Volvo (Target Vehicle)**.  The female sold CI # 2, two pounds of methamphetamine for $5000, allowing CI # 2 to owe the female $600, to be paid back during future transactions. Agents showed CI # 2 a booking photo of BOOKER.  CI # 2 positively identified BOOKER as the female who sold CI # 2 the two pounds of methamphetamine.  Case agents later field-tested the suspected methamphetamine which tested positive for the presence of methamphetamine with a weight of 1048 grams.

b.  **Controlled Buy July 11, 2024**

23.     On July 11, 2024, case agents conducted a second controlled purchase of methamphetamine from BOOKER.  Prior to arranging the controlled buy, CI #1 spoke to "Lovely Symon" (BOOKER) on Facebook Messenger.   BOOKER agreed to sell two pounds of methamphetamine to CI # 2 for $5600.   During this controlled buy, agents conducted pre-surveillance at 4204 Manhattan Drive, Racine, Wisconsin.  Agents identified the **Volvo** (**Target Vehicle)** in the driveway of at 4204 Manhattan Drive, Racine, Wisconsin.

24.     Prior to the controlled buy, CI # 2 received a call from a blocked source. Upon CI # 2 answering the call BOOKER asked, "you on the way?"  Case agents recognized BOOKER's voice from the prior interaction.  CI # 2 responded, and the meet location was confirmed. CI # 2 went to the parking lot of a Petro Mart at 717 South Sylvania Avenue, Sturtevant, Wisconsin. Case agents observed BOOKER leave 4204 Manhattan Drive, Racine, Wisconsin and enter the **Volvo (Target Vehicle)**. Agents followed BOOKER in the **Volvo (Target Vehicle)** to the Adams Trail Apartments at 4114 Northwestern Avenue, Racine, Wisconsin 53405.   BOOKER left the apartments and was next observed arriving at the parking lot of a Petro Mart at 717 South Sylvania Avenue, Sturtevant, Wisconsin. The **Volvo** (**Target Vehicle**) parked next to CI # 2's vehicle. BOOKER exited the **Volvo** (**Target Vehicle)** and enter CI # 2's vehicle.  BOOKER sold CI # 2 two pounds of methamphetamine for $5600.  CI # 2 also provided BOOKER with $600 for repayment of the transaction completed on June 27, 2024. BOOKER exited CI # 2 vehicle and returned to the **Volvo (Target Vehicle)**.  Case agents surveilled BOOKER leave the parking lot and travel to Educators Credit Union Bank at 1400 Newman Road, Racine, Wisconsin.  CI # 2 drove directly back to the predetermined meet location.  Case agents later field-tested the suspected methamphetamine which tested positive for the presence of methamphetamine with a weight of 986 grams.

11

c. **Controlled Buy August 8, 2024**

25.     On August 8, 2024, case agents conducted a controlled purchase of fentanyl pills from BOOKER.  BOOKER agreed to sell CS # 2, 1,500 "Blues" (fentanyl pills) for $7,500.  Case agents completed pre-surveillance at 4204 Manhattan Drive, Racine, Wisconsin.  Case agents observed the **Volvo** (**Target Vehicle)** in the driveway of 4204 Manhattan Drive, Racine, Wisconsin.  Just prior to controlled buy, case agents observed BOOKER leave 4204 Manhattan Drive, Racine, Wisconsin in the **Volvo (Target Vehicle)**.  Case agents followed BOOKER, to a nearby grocery store, where she stopped entered and re-emerged with a small bag.  BOOKER re-entered the **Volvo** (**Target Vehicle**) and continued to the drug transaction location.

26.     Case agents met with CI # 2.  CI # 2 notified agents, BOOKER was in possession of the fentanyl pills and was ready to deliver the pills to CI # 2.  CI # 2 received a phone call from telephone number 262-221-0687 believed to be BOOKER based on case agents recognizing her voice.  BOOKER confirmed the drug transaction. CI # 2 went to Petro Mart at 717 South Sylvania Avenue, Sturtevant, Wisconsin.  BOOKER arrived prior to CI # 2's arrival.  CI # 2 parked near the **Volvo** (**Target Vehicle**).  BOOKER exited the **Volvo** (**Target Vehicle**) and entered CI # 2's front passenger seat.  BOOKER delivered to CI # 2 a clear plastic bag containing a large number of blue pills.  CI # 2 handed BROOKER $7,500 for the pills.  CI # 2 and BOOKER discussed BOOKER traveling to pick up hundreds of thousands of "blues" for future sales.  BOOKER exited CI # 2's vehicle and entered the **Volvo** (**Target Vehicle**).  Surveillance followed BOOKER in the **Volve** (**Target Vehicle**) to a parking lot where she briefly stopped and then back to 4204 Manhattan Drive, Racine, Wisconsin.

27.     CI # 2 drove met with case agents and turned over the pills. Case agents later field-tested and counted the suspected fentanyl pills.  Case agents counted 503 pills which tested positive

12

for the presence of fentanyl with a weight of 58.8 grams. It was found BOOKER shorted CI # 2 approximately 1000 pills. CI # 2 was notified of the number of pills shorted by BOOKER.

### d. Narcotics Transaction September 12, 2024

28. Prior to September 12, 2024, case agents conducted surveillance at BOOKER's residence of 4204 Manhattan Avenue, Racine, Wisconsin and it appeared she was no longer residing at the location. Case agents reviewed Wisconsin Department of Transportation information, RAPD Automated License Plate Reader (ALPR) results, and spot-checked location known to be frequented by BOOKER. Case agents determined BOOKER moved from 4204 Manhattan Avenue to **1030 Harbridge Avenue, Racine, Wisconsin (Target Location).**

29. On September 12, 2024, CI # 2 conducted a controlled transaction with BOOKER. BOOKER offered to deliver to CI # 2 the 1000 fentanyl pills shorted from the August 08, 2024, controlled buy transaction and sell CI # 2 an additional 1000 pills. Case agents instructed CI # 2 to only receive the 1000 pills shorted and to not purchase any additional pills.

30. Case agents conduct surveillance at **1030 Harbridge Avenue, Racine, Wisconsin (Target Location)** prior to the drug transaction**.** Case agents observed the **Volvo** (**Target Vehicle)** in the driveway of **1030 Harbridge Avenue, Racine, Wisconsin. (Target Location).** Just prior to controlled buy, case agents observed BOOKER leave **1030 Harbridge Avenue, Racine, Wisconsin (Target Location)** in the **Volvo (Target Vehicle)**. Case agents followed BOOKER, to the drug transaction location.

31. CI # 2 met with case agents. CI # 2 called BOOKER at telephone number 262-221-0687 and made contact with BOOKER. Case agents recognized BOOKER's voice during the contact. BOOKER confirmed the drug transaction. CI # 2 went to Petro Mart at 717 South Sylvania Avenue, Sturtevant, Wisconsin. BOOKER arrived prior to CI # 2's arrival. CI # 2 parked

near the **Volvo** (**Target Vehicle**). BOOKER exited the **Volvo** (**Target Vehicle**) and entered CI # 2's front passenger seat. BOOKER delivered to CI # 2 a black plastic bag containing a large number of blue pills. BOOKER told CI # 2, "Munch", known to case agents from prior criminal contacts as Marquan L. WASHINGTON (DOB XX/XX/1991) was currently in possession of her supply of fentanyl pills. BOOKER explained that WASHINGTON told BOOKER, he would help distribute/sell her pills. BOOKER told CI # 2, WASHINGTON had been the individual who counted/packaged the pills BOOKER delivered to CI # 2 in the black plastic bag. CI # 2 and BOOKER came to the understanding CI # 2 would take the pills delivered by BOOKER, make no payment for any possible additional pills, and return to BOOKER for additional purchases of pills in the future.

32.     After the drug transaction, CI # 2 drove met with case agents and turned over the pills. Case agents later field-tested and counted the suspected fentanyl pills. Case Agents counted 963 pills which tested positive for the presence of fentanyl with a weight of 105.7 grams.

## ADDITIONAL INVESTIGATION AND SURVEILLANCE OF BOOKER

33.     A check of law enforcement data bases and United States Postal Service (USPS) data bases shows that BOOKER resided at 4204 Manhattan Drive, Racine, Wisconsin. During the course of this investigation case agents were aware of mail and packages regularly being sent to Karina S. BOOKER at 4204 Manhattan Drive, Racine, Wisconsin. Karina S. BOOKER previously had provided 4204 Manhattan Drive, Racine, Wisconsin to the Wisconsin Department of Transportation as her home address.

34.     Case agents reviewed Mount Pleasant Police Department (MPPD) records that indicate on February 4, 2023, Karina S. BOOKER had a listed address at 4204 Manhattan Drive, Racine, Wisconsin during a traffic stop arrest.

14

35.     On February 4, 2023, BOOKER was the subject of a traffic stop by MPPD officers for a traffic violation.  BOOKER was operating **the maroon 2008 Volvo CX90 SUV bearing North Carolina license plate, KAV6000 (Target Vehicle)**. The **Volvo (Target Vehicle)** was used during the undercover controlled buys on June 27, 2024, July 11, 2024, and August 8, 2024.  During the traffic stop BOOKER was arrested for OWI 1st offense and found in possession of a firearm in her purse and a second loaded magazine in her glove compartment.  One of the passengers in the **Volvo (Target Vehicle)** was identified as her 4-yr old son.  Corresponding citations were issued to BOOKER at her last known address of 4204 Manhattan Drive, Racine, Wisconsin.

36.     As of the latter part of August 2024 into September 2024, case agents conducting surveillance of BOOKER, did not observe BOOKER or the **Volvo (Target Vehicle)** at 4204 Manhattan Drive, Racine, Wisconsin.  Case agents suspected BOOKER moved.  On September 5, 2024, case agents reviewed updated Wisconsin Department of Transportation information for BOOKER.  Listed in the information was BOOKER'S updated address of **1030 Harbridge Avenue, Racine, Wisconsin, 53403 (Target Location)**.  The address had been updated July 16, 2024.

37.     As of September 6, 2024, case agents completed checks of the RAPD ALPR system.  Results showed on Sept 6, 2024, at 3:58 PM RAPD squad R-17 driven by Officer Pitts captured the **Volvo (Target Vehicle)** parked in the 1000 blk of Harbridge Avenue, Racine, Wisconsin opposite side of the street, near **1030 Harbridge Avenue, Racine, Wisconsin (Target Location).**  Also on September 6, 2024, at 4:55 PM, RAPD squad R-8 driven by Officer Harbison captured the **Volvo (Target Vehicle)** parked in the driveway of **1030 Harbridge Avenue, Racine, Wisconsin (Target Location).**

15

38.     As of September 6, 2024, case agents completed spot checks of **1030 Harbridge Avenue, Racine, Wisconsin (Target Location).**  On September 12, 2024, at 7:15 AM, case agents observed and documented the **Volvo (Target Vehicle)** parked in the driveway of **1030 Harbridge Avenue, Racine, Wisconsin (Target Location).**  On September 17, 2024, at 1:04 PM, case agents observed and documented the **Volvo (Target Vehicle)** parked in the driveway of **1030 Harbridge Avenue, Racine, Wisconsin (Target Location).**  On September 18, 2024, at about 7:10 AM, case agents observed the **Volvo (Target Vehicle)** parked in the driveway of **1030 Harbridge Avenue, Racine, Wisconsin (Target Location)**.  At approximately 8:09 AM, case agents observed the **Volvo (Target Vehicle)** exit out of the driveway of **1030 Harbridge Avenue, Racine, Wisconsin (Target Location)** and travel to a local school where a young child exited the **Volvo (Target Vehicle)** and enter the school.  Based on the investigation into BOOKER, case agents are aware that BOOKER has a child that attends that local school.  Case agents then observed BOOKER driving the **Volvo (Target Vehicle)**.  BOOKER drove the **Volvo (Target Vehicle)** to **1030 Harbridge Avenue, Racine, Wisconsin (Target Location).**  BOOKER then parked the **Volvo (Target Vehicle)** in the driveway of **1030 Harbridge Avenue, Racine, Wisconsin (Target Location).**

39.     On September 16, 2024, case agents inquired with United States Postal Inspection Service (USPIS) of BOOKER'S possible change of address.  USPIS reported BOOKER was receiving mail at **1030 Harbridge Avenue, Racine, Wisconsin (Target Location).**  Case agents were informed by USPIS that BOOKER received a 3-pound express box from Arizona at **1030 Harbridge Avenue, Racine, Wisconsin (Target Location)** on September 3, 2024.  Based on the investigation into BOOKER and statements made by BOOKER during the investigation, case agents believe this parcel likely contained controlled substances.

40.     Case agents have last observed BROOKER at **1030 Harbridge Avenue, Racine, Wisconsin (Target Location)** on September 18, 2024.  Case agents last observed BOOKER operating the **Volvo (Target Vehicle)** on September 18, 2024.

### COMPUTERS, CELLPHONES, ELECTRONIC STORAGE, FORENSIC ANALYSIS

41.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the **Target Location** and **Target Vehicle,** and on Karina S. BOOKER, in whatever form they are found. One form in which the records might be found is data stored on a cellular telephone or computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

42.     *Probable cause.* I submit that if a computer, cellular telephone, or electronic storage medium is found at the **Target Location** and **Target Vehicle,** and on Karina S. BOOKER, there is probable cause to believe records associated with the drug trafficking organizations' activities will be stored on the same, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that this drug trafficking organizations frequently uses cellular telephones, electronic devices, and other messaging applications, like social media, to communicate.

    b.  I also know, based on my knowledge, training, and experience, that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    c.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record

17

of deleted data in a "swap" or "recovery" file.

    d.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    e.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

43.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how such electronic devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Target Location** and **Target Vehicle,** and on Karina S. BOOKER because:

    a.  Data on the computer, cellular telephone, or storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.  As explained herein, information stored within a computer, cellular telephone, and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and

18

experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a cellular telephone or computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether

19

data stored on a cellular telephone or computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a cellular telephone or computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a cellular telephone or computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The cellular telephone or computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The cellular telephone or computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a cellular telephone or computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

44. *Necessity of seizing or copying entire computers, cellular telephones, or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of cellular telephone or computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be

20

unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site;

b. <u>Technical requirements</u>. Cellular telephone and computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge; and

c. <u>Variety of forms of electronic media</u>. Records sought under this warrant could be stored in a variety of storage media formats that may require off- site reviewing with specialized forensic tools.

45. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying cellular telephones, computers, and storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

46. Because multiple people share the **Target Location**, it is possible that the **Target Location** will contain cellular telephones, computers, or storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of

21

those items as well.

**BIOMETRIC UNLOCK**

47.     The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

48.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

49.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

50.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in

22

front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID. If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

51.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

52.    As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

53.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of

23

time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

54.     Due to the foregoing, during the execution of the search, if BOOKER is reasonably believe by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant,  it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of BOOKER to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of BOOKER's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

55.     Based on the forgoing, I believe there is probable cause to believe Karina S. BOOKER (DOB: XX/XX/1994) and other known and unknown individuals have and are committing violations of Title 21, United States Code Sections 841(a)(1), 843 and 846.  I further believe that there is probable to believe that located at and in the **Target Location** and **Target Vehicle,** and on Karina S. BOOKER, further described in Attachments A, there is evidence of these crimes, all of which is detailed more specifically in Attachment B, that a warrant issue authorizing the search of the same.

24

## ATTACHMENT A1

## PLACE TO BE SEARCHED

**1030 Harbridge Avenue, Racine, Wisconsin** (**Target Location**).  This address is utilized by Karina S. BOOKER.  Described as a single-story residence located at **1030 Harbridge Avenue in Racine, Wisconsin 53403**. The residence has blue siding and white trim. The numbers "1030" are affixed on the east portion of the south porch post.



25

# ATTACHMENT A2

## PROPERTY TO BE SEARCHED

The property to be searched is a maroon 2008 Volvo CX90 SUV bearing North Carolina license

plate KAV6000.



26

## ATTACHMENT A3

## PERSON TO BE SEARCHED

The person to be searched is Karina S. BOOKER (DOB: XX/XX/1994).



27

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

All records, information, and items relating to violations of 21 U.S.C. §§ 841(a)(1), 843 and 846, between June 1, 2024 to present including:

a.  Evidence of the crime described above;

b.  Controlled substance, including fentanyl and methamphetamine, paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;

c.  Preparatory steps taken in furtherance of that crime;

d.  Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;

e.  Evidence of motive, intent, or knowledge of the crime described above;

f.  Evidence of the location, whereabouts, and patterns of travel of Karina S. BOOKER;

g.  Evidence about the appearance, clothing, and identity of Karina S. BOOKER;

h.  All bank records, checks, credit card bills, account information, and other financial records;

i.  Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

j.  Lists of drug customers and related identifying information;

k.  Types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

l.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

m.  Indicia of residency and ownership;

n.  Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

o.  U.S. Currency;

p.  Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation; and

28

q. Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the locations or person described in Attachments A, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of Karina S. BOOKER to the fingerprint sensor ("Touch ID") and (2) to present the face of Karina S. BOOKER to the facial recognition sensor, such as a camera, ("Face ID") of the device found at the Target Location, Target Vehicle or on Karina S. BOOKER, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

Note: The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers. If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.

29